**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Barbara Patterson,                              )
                                                )       No. CV 07-1476-PHX-PGR
                          Plaintiff,            )
                                                )       **ORDER**
v.                                              )
                                                )
Dora Schriro, et al.,                           )
                                                )
                          Defendants.           )
_____)

On May 15, 2007, Barbara Patterson ("Plaintiff" or "Patterson") filed a 42 U.S.C. § 1983 civil rights Complaint on behalf of her son and herself in Superior Court. Therein she alleged violations under the Eighth and Fourteenth Amendments of the United States Constitution.

Patterson's son Aaron committed suicide on May 12, 2005 at the Arizona Department of Corrections ("ADC").[1] Subsequent to finding Aaron unresponsive, ADC security staff performed a cell extraction and Aaron was taken to the Health Unit where he was pronounced dead at 0843 hours. Patterson contends that the "deliberate indifference" of the named Defendants[2] resulted in the death of her son Aaron in violation of the Eighth

_____

[1] Aaron committed suicide by stuffing a wad of toilet paper down his throat. He received the toilet paper after requesting it from a night correctional officer who was no longer on duty at the time Aaron was found unresponsive.

[2] In her Complaint, Plaintiff named the following defendants: Correctional Officer II Matthew Shaw, Sergeant Ronald Carlson, Correctional Officer II Gavino Lechuga, Deputy

Amendment. She further asserts that the Defendants' conduct "shocks the conscience" in violation of Aaron's substantive due process rights under the Fourteenth Amendment. Finally, Plaintiff alleges substantive due process claims against the Defendants under the Fourteenth Amendment on her own behalf based on the loss of the life of her child and for the continued loss of her child's association.

The Defendants filed a "Notice of Removal" pursuant to 28 U.S.C. §1441 to remove the case from state court and bring it before the federal court.[3] Specifically, 28 U.S.C. §1331, provides that district courts have original jurisdiction over all civil actions arising under the Constitution and laws of the United States. See also City of Chicago v. International College of Surgeons, 522 U.S. 156 (1997). Plaintiff's claims of Eighth and Fourteenth Amendment violations clearly fall within the jurisdictional parameters of 28 U.S.C. §1331. Accordingly, original jurisdiction in federal court is proper. On August 2, 2007, this case was properly removed to the United States District Court for the District of Arizona.

After removal, Licensed Practicing Nurse Jesus Gutierrez filed his pending motion for summary judgment on all charges filed against him by Plaintiff. (Doc. 71.) Thereafter, Correctional Officers Matthew Shaw and Gavino Lechuga, as well as Sergeants John McClaine and Ronald Carlson together filed a separate motion for summary judgment on all

---

Warden Johnny Tucker, Sergeant McClaine, Psychology Associate Jeanie Cooper, Director of the Arizona Department of Corrections Dora Schriro, Licensed Practicing Nurse Jesus Gutierrez, Licensed Practicing Nurse Maroni, Correctional Officer Betty Esterline, and Correctional Officer Bryant Millwee. The Defendants remaining in this case are Officers Matthew Shaw and Gavino Lechuga, Sergeants John McClaine and Ronald Carlson, Nurse Jesus Gutierrez, and Psychology Associate Jeanie Cooper. Cooper's motion for summary judgment will be addressed in a separate order. All Defendants addressed in this Order are referred to collectively throughout as "Defendants."

[3] Section 1441, 28 U.S.C. provides in relevant part:
(a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

charges filed against them by Plaintiff (Doc. 72.)  The Court will address both of the motions as follows.

I.      Factual Background[4]

<u>Aaron's Mental Health History Prior to and During his Stay at ADC</u>

On June 8, 2001, Aaron stabbed his stepfather Troy Steven Longley to death at his residence in Bisbee, Arizona. On September 19, 2002, Aaron pled guilty to manslaughter in Cochise County, Superior Court.  Aaron also plead guilty to first-degree burglary.  He was sentenced to a term of four (4) years imprisonment at the ADC on Count I (manslaughter) and seven (7) years intensive probation to begin immediately upon release from ADC on Count II (first degree burglary).  On October 3, 2002, Aaron was transferred from Cochise County to the Arizona State Prison Complex, Phoenix, Alhambra Unit for processing into the Arizona prison system.

The ADC administered a routine battery of tests designed to provide a reference point to evaluate Aaron's medical and mental health needs as well as Institutional and Public risk factors for appropriate placement within the prison population.  Aaron provided a substantial amount of information related to his medical and mental health history.[5]  Based on the

---

[4] The following facts are ascertained directly from the parties' statements of facts and corresponding exhibits.

[5] Aaron denied the following: ever being admitted to a psychiatric hospital;  seeing a psychiatrist or other mental health professional; taking medication for emotional problems, mental illness or nerves; having serious head injury; experiencing auditory or visual hallucinations; experiencing perceptions of thought insertion, broadcasting, or mind control; experiencing beliefs of paranoia; experiencing any episodes of mania (when not using drugs or alcohol); ever having attempted suicide; being a victim of sexual or physical abuse; having a history of violent or aggressive behavior; having a history of emotional problems while previously being in jail or incarcerated; any current suicidal ideation; or having any serious episodes of depression while admitting to the heavy use of marijuana and alcohol since the age of thirteen (13).

information provided, Aaron was assigned a mental health score of 1.[6]  On October 3, 2002, Aaron executed a mail waiver and stated that he wanted *no one* notified in the event he sustained a serious illness, accident, or death.

On October 9, 2002 Aaron completed his initial inmate intake process and was transferred from Alhambra processing facility to the Arizona State Prison Complex in Tucson.  Aaron was placed in general population.  Psychologist Brautigam assessed Aaron with "major depression."

On December 3, 2002, Aaron provided a significantly different history of mental health than he had provided upon intake.  Aaron revealed a history of depression and having been in and out of a mental health center while taking the medication Paxil.  Aaron also revealed a suicide attempt in 1997 or 1998, at which time he cut his arm while in a drug rehabilitation center.  He stated that both his mother and father have a history of psychiatric illness.  Aaron conveyed that he began using drugs at age nine.[7]  An "Institutional Need Consultation Referral" was ordered for reclassification and a response was prepared by Dr. Taylor.  He recommended that Aaron's mental health score be raised and he be assigned to a mental health unit.  Aaron was transferred and he consented to the administration of psychotropic medication.  He was then placed on his first 10 minute suicide watch.  Thereafter, Aaron was placed on and off suicide and mental health watch[8] until his suicide

---

[6] A Mental Health Care Needs Scoring Criteria of 1 means that the inmate does not require placement in an institution that has regular psychological and psychiatric staffing and services.  This occurs when the inmate has *no known history of mental health problems or treatment*.

[7] The drugs he admitted to using were: marijuana, alcohol, sniff glue, paint, gas, cocaine, crack, methamphetamines, LSD, mushrooms, PCP.

[8] Suicide and mental health watches are ordered by the psychology staff when there is a possibility of an inmate hurting himself.  The watches require security staff to monitor the inmate by checking on him every 10 or 30 minutes, respectively, to ensure that he is alive.  Security is also responsible to keep track of the inmate's behavior in an observation log. An inmate on a mental health watch is placed in a holding cell and any item of clothing

on May 12, 2005.

On January 2, 2003, Aaron grabbed the crotch of a female correctional officer which resulted in Aaron being charged with assaulting staff. He was disciplined therefor. While in the holding cell, Aaron took his sheet and tied it to the "cage" to form a noose. Aaron was found by security staff standing with a sheet knotted around his neck.

Aaron was taken for crisis contact. He denied suicidal intent and admitted that he had not taken his medication for two days because he didn't think he needed it. He believed that people constantly picked on him. He admitted that when he thought about killing people, it made him feel better. Aaron then cried when he was told he was being put on suicide watch. He became aggravated and verbally abusive to the psychology associate. He also became belligerent and reported to Dr. Kaz that he didn't know if he intended to kill himself. Later that afternoon, Dr. Kaz again met with Aaron. Dr. Kaz advised members of security that if necessary, they should remove Aaron's clothing for security purposes. Suicide watch was continued.

Throughout January, the record reflects that Aaron had poor coping skills. He admitted to having used the knotted sheet in autoerotic strangulation/asphyxiation and he was found guilty of sexual assault on another staff member on January 16, 2003. Staff noted his behavior as manipulative with sexual innuendos and expressions. Staff further noted that while on suicide watch, Aaron was most frequently observed sleeping or resting quietly without acknowledging the staff during observations.

On January 21, 2003, Dr. Kaz discussed with Aaron that he was being moved to SMU-II Mental Health Unit. Aaron was amenable to that move. Dr. Kaz again noted that Aaron had poor coping skills and that he needed regular "psych" follow up. Dr. Kaz

or personal property that could be used by the inmate to harm himself is confiscated pursuant to psychology staff orders. Security staff is not authorized to make any independent determination as to what an inmate on mental health watch is allowed to possess. The observation log contains a code with lower-case letters representing various behaviors that has commonly exhibited.

removed Aaron from suicide watch and placed him on 30 minute mental health watch. Aaron remained on 30 minute mental health watch until January 30, 2003. At that time, he told security staff that he was going to kill himself and that his mother told him he would kill himself. He also stated that the devil was coming and that in his dreams, his parents are dead. Aaron also kicked the door into Dr. Kaz. The assessment was major depression, psychosis, and violent behavior. He was placed on 10 minute suicide watch.

Throughout February, records indicate that he spent much of his time on suicide and mental health watch. The observation logs reveal that he was observed quietly lying down, resting, or sleeping while members of the staff did their rounds.

Upon his arrival at SMU II[9] Mental Health Unit on February 7, 2003, Aaron was interviewed by Dr. Backlund. Aaron discussed his history of drug use and the rush he got from tying a sheet around his neck. He denied wanting to die and admitted wanting to visit Disneyland. Aaron admitted to wanting more attention and to hearing voices. Dr. Backlund opined that Aaron's risk to himself was low and discontinued his suicide watch.

On February 17, 2003 Aaron exposed his genitals to a correctional officer when she opened the food trap. A few hours later, Aaron assaulted an ADC staff officer by grabbing the officer's arm and key set as the officer attempted to remove handcuffs from Aaron. Aaron was subsequently charged with assault for both occurrences. He was disciplined therefor. Aaron's suicide watch continued. He was then seen by Dr. Herron who recommended that Aaron be transferred to Phoenix Complex, Baker Ward Mental Health Facility ("Baker"). He further recommended an adjustment be made to his medications.

Aaron's treatment plan at Baker included addressing: the fact that Aaron's adolescence and early adulthood was largely spent incarcerated; Aaron lied profusely and had done a significant amount of drugs; Aaron's manipulative conduct; his denial of

---

[9] SMU I and II generally house aggressive inmates, some who feign or exaggerate their medical symptoms for increased attention from staff or in attempts to assault members of the staff.

hallucinations, delusions, obsessions/compulsions; and his denial of pre-admission or present suicidal feelings.

In March 2003, Aaron became disruptive during pill call and required lock-down. Dr. Clearly noticed fresh bruises on Aaron's neck where he had applied pressure in a sexually motivated attempt at partial-asphyxiation consistent with previous behavior. On March 5, 2003, Aaron was placed back on suicide watch after reporting that his dead stepfather told him to kill himself. The following morning, Aaron again made a determined suicide attempt. Suicide watch was continued. The next day, Aaron refused medication. The following day, Aaron opened sutures on his head. Later that day, Aaron confided in Dr. Tee that he wanted to shoot himself. Suicide watch was continued.

At Baker, Aaron received continuous mental health care from February 18, 2003 until the middle of August 2003. On August 7, 2003, he was determined to be stable on psychotropic medications. Therefore, on August 19, 2003, Aaron was transferred to SMU I. Over the next several months, Aaron's psychological logs document improvement with his moods. They show that he had no homicidal or suicidal ideation and that Aaron appeared generally stable. The reports note that he was receiving the necessary treatment.

From approximately December 1, 2003 to January 29, 2004, Aaron's mental health cell-front logs denote that he was observed primarily sleeping with no significant problems. On February 3, 2004, Aaron was seen by Dr. Herron for mental health treatment. Aaron stated that he believed he was improving. Dr. Herron noted that Aaron spent the majority of time sleeping, but Aaron did not seem to mind because it helped his depression.

Until March 30, 2004, Aaron was observed sleeping the majority of the day with no significant changes. Aaron's mental health treatment was continued. Aaron's conduct remained consistent until July 2004 when he refused his medication and refused to sign a refusal form. Throughout the summer, the mental health team met to create a plan for Aaron's major depression, mood disturbance, and psychotic symptoms. The team noted that overall, Aaron remained stable and cooperative.

On November 2, 2004, Aaron was seen by Dr. Herron. Aaron stated that he was sleeping all day until dinner, he denied hallucinations, had a little depression, and had no suicidal ideation or current suicidal plans or intent. On February 16, 2005, Aaron again met with Dr. Herron. Aaron complained that his medication was no longer working, he was depressed, hearing voices, and having feelings of hopelessness. Dr. Herron ordered medications and notified staff about Aaron's thoughts of self harm.

On March 4, 2005, Aaron had in his possession what appeared to be a homemade stinger wrapped in a washcloth. The following day, Aaron pulled a telephone out of the wall. A few days later, Aaron denied any suicidal ideation. Security noted that he had slept all day. Dr. Herron restarted Aaron on Haldol, a medication Aaron had previously taken, and referred Aaron to psychology. Later that week, Aaron denied any suicidal intention or plans and reported no current depression. Aaron's cell-front logs from March 1, 2005 to March 31, 2005 note that he was "generally stable and cooperative."

On April 10, 2005, Aaron was transferred from SMU II Mental Health Wing to SMU I Mental Health Wing. At 0945 hours, Aaron notified Nurse Myers ("Myers") that he was going to kill himself. He began banging his head, kicking the door, demanding to be transferred to Baker. Aaron was placed on 10 minute suicide watch by Dr. Arnold. Later that afternoon, Aaron was observed by Myers to be singing, sitting quietly, smiling at passing staff, cooperative with medication, and having a good appetite. However, the next day, at 1000 hours, Aaron again complained that he wanted to return to Baker. He threatened that if he couldn't go to Baker, he would again bang his head. He refused his medication and complained of depression. Six hours later, Aaron said he was feeling better, he wanted a book to read, and was trying not to "do anything stupid" so he could come off watch the next day. His suicide watch was continued. On April 13, 2005, Aaron was transferred back to SMU II Mental Health Unit. Documents reflect that Aaron had not been taking his medication since April 5, 2005.

On April 26, 2005, Aaron requested an HIV/Hep. C test. He indicated that he was bleeding from his rectum due to a razor blade he had swallowed. On April 28, 2005, Aaron told mental health staff that he was not taking any of his medication because he did not need them and they did not work. He only wanted medication to sleep. He denied having hallucinations. The medical staff advised Aaron to continue taking his medication until he met with Dr. Herron. The medical staff also advised Aaron that his depression and psychosis increases when he doesn't take his medication.

On May 2, 2005, at 1000 hours Aaron was seen by staff with a bleeding scalp and wrist. He admitted to banging his head and cutting his wrist with a "spork." He stated that unless he was given something that would calm him down, he would continue to hurt himself. Aaron was placed on a 10 minute suicide watch. Nurse Dixon noted that she responded ten minutes later to an IMS of Aaron self-abusing. She observed a one and a half inch laceration to his forehead and a superficial laceration to his left wrist. Suicide watch was continued.

On May 3, 2005, Aaron told mental health staff that he hadn't heard from his mother in over a month and that made him sad. He also said he had not heard voices for four days and he didn't want to hurt himself. Suicide watch was changed to a 30 minute mental health watch.

On May 4, 2005, mental health staff cancelled the mental health watch. Later that day, Aaron told Nurse Grant that he had been pacing around and had passed out because he was dizzy. He stated that he had started his new "psych meds" that day which may have caused the dizziness. On or about May 5, 2005 was Mother's Day. Plaintiff came to visit Aaron, but he refused her visit, stating "she just makes it worse" because she was "mean to him."

On May 6, 2005, Aaron was seen by mental health staff Jeanie Cooper ("Cooper") at his cell front. He complained that he needed to go to Baker. He also stated that he wanted to go to Heaven because it is a better place. Cooper did not have the authority to transfer him

to Baker. She relayed to her superiors his request to be transferred to Baker and discussed the encounter with her teammates. Consequently, Aaron was placed back on a 30 minute mental health watch.

Over the course of the next few days, mental health watch was continued. The logs indicate that Aaron spent much of his time lying down quietly with no distress. Therefore, on May 9, 2005, mental health watch was discontinued. On May 10, 2005, Aaron was again seen by Cooper at his cell front because he was lying in bed requesting a diaper. He had been urinating and making bowel movements in his sheet. Despite appearing calm, Aaron refused to answer Cooper's questions. After the meeting with Aaron, Cooper discussed Aaron's treatment plan with her teammates. Cooper placed Aaron on a 30 minute mental health watch.

The following day, Aaron was quiet through the night shift. The next morning, he was again seen by Cooper. He told her that he was doing well, just "kicking back" and that he would be good if given another chance. He asked to go to his room. Mental health watch was continued.

SMU I Mental Health Unit and the Staff During the Final Hours of Aaron's Life

According to the observation logs from May 2, 2005 through May 12, 2005, members of security staff noted that during their checks, Aaron was primarily quiet and sleeping, either lying down in the cell or sitting quietly.[10] On May 12, 2005 the day Aaron committed suicide, Correctional Officer[11] Shaffer ("Shaffer" is not a defendant) recorded at

---

[10] There are two exceptions, on May 2, 2005, at 1750 hours and 1800 hours Aaron was threatening and standing still, respectively, and subsequently he was quiet and confused. On May 3, 2005, Aaron was observed "briefly yelling."

[11] In this opinion, correctional officers are referred to as security officers or security staff. At the ADC, members of the security staff, such as officers Shaw and Lechuga, are responsible for securing the inmates in their cells to ensure the safety of the inmates and staff. Security staff is not authorized to diagnose or treat inmates for medical/mental health problems. With respect to medical issues, the responsibility of security staff is limited to securing the inmate for examination by medical staff. Security staff is not privy to the exact

approximately 0600 hours that Aaron was lying or sitting quietly in the holding cell. At approximately the same period of time, Correctional Officers Matthew Shaw ("Shaw") and Gavino Lechuga ("Lechuga") began their day shifts as the house officer and escort officer, respectively, for Aaron's area of APSC-Eyman SMU I.

Shortly after their arrival, they attended their morning briefing where they were informed that Aaron was in the holding cell for a 30 minute mental health watch. Immediately after the briefing, they reported to their posts. According to the observation log Shaffer had last checked on Aaron and signed the log at 0620 hours. He recorded that Aaron was quietly lying or sitting in the cell in the same position in which Shaw later observed Aaron.

At approximately 0650 hours, Shaw checked on Aaron and believed he observed Aaron's chest rising and falling, that Aaron was breathing and still resting quietly. Shaw filled out the log to that effect. At 0720 hours and 0750 hours, Shaw checked on Aaron and logged that he was lying down quietly in approximately the same position he had been in during the previous checks. Shaw believed that Aaron continued to be breathing and was resting quietly. During one of his checks, Shaw thought he observed Aaron move his finger or his hand in what he believed to be a direct and purposeful response to Shaw knocking on the door and calling Aaron's name. Shaw did not observe anything during any of his checks that caused him to believe that Aaron was in medical distress.

Prior to Shaw's next scheduled check on Aaron, psychology associate William Memo Grassman ("Grassman") came into the unit and stopped at the holding cell.[12] Grassman called to Shaw and Lechuga and informed them that he was having trouble getting a response from Aaron. Lechuga went to the holding cell to perform a check while Shaw went to inform Correctional Officer Betty Esterline, a more senior security staff member on duty that day.

diagnoses of the inmates or the medications taken by the inmates.

[12] The next scheduled check would have been performed no later than 0820 hours, thus this occurred sometime after 0750 hours and prior to 0820 hours.

At approximately 0810 hours, Sergeant John McClaine ("Sergeant McClaine") was conducting a walk through of the wing and noticed Lechuga and Shaw attempting to get the attention of Aaron. Sergeant McClaine approached the holding cell and observed Aaron lying down in the corner of the holding cell with his head propped up against the bench.[13] Sergeant McClaine also believed that Aaron was sleeping. Nevertheless, he tried to get his attention. He tried to sprinkle water on Aaron, but to no avail. Sergeant McClaine had no specific knowledge regarding the medication Aaron was taking.[14] Furthermore, Sergeant McClaine testified that despite not getting an immediate response from Aaron, he did not observe anything that caused him to believe that there was an *emergency situation* or that Aaron was in any *serious medical distress*. Sergeant McClaine then reviewed the observation logs for the previous several security checks on Aaron that day and entered a notation stating that nothing seemed peculiar about the observations.

At 0815 hours, Sergeant Ronald Carlson ("Sergeant Carlson") heard over the radio broadcast that he had a telephone call. He walked toward the pod office to use the phone across the hall from Aaron's holding cell. Sergeant Carlson noticed Lechuga and Sergeant McClaine attempting to get the attention of Aaron. He looked into the holding cell and he too thought he saw Aaron breathing. He did not observe any signs that Aaron was in serious medical distress.[15] Nevertheless, Sergeant Carlson attempted to get a water cannon from the fire hatch to elicit a response from Aaron, but the key for that cannon did not function.

The staff had not received a response from Aaron after exhausting protocol efforts such as calling out his name, banging on the cell, spraying him with water in an attempt to elicit a physiological response, etc. Therefore, at 0822 hours, Sergeant McClaine activated

---

[13] This is the lying position referred to throughout this order.

[14] Some prisoners take medications that can put them in a catatonic-like state.

[15] According to the record, water is used because it has been demonstrated to be an effective tool to determine whether an inmate is feigning maladies.

an Incident Management System[16] ("IMS") and ordered the A-Team[17] and medical staff to respond to Aaron's holding cell. As the officer who activated the IMS, Sergeant McClaine was considered the incident commander. At approximately 0823 hours, Sergeant Carlson found a plastic cup that he filled with water.[18] He attempted to throw the water onto Aaron through the food trap of the cell door. Aaron did not respond. Sergeant Carlson ordered Shaw to retrieve a different water cannon so he could spray Aaron to get a response. Sergeants McClaine and Carlson continued to attempt to elicit a response from Aaron.

At 0826 hours, Correctional Officer Sanchez arrived on the scene with the IMS video camera and Nurse Gutierrez ("Gutierrez") arrived on the scene in response to the call for medical staff. According to testimony, Gutierrez observed Aaron through the trap door and opined that he believed that Aaron was breathing. Medical staff is not permitted to physically examine prisoners until after the prisoner has been extracted from the cell. During the same period of time, Lieutenant York ("York") arrived on scene and called Deputy Warden Tucker to advise him of the situation. Based on the phone call, York instructed Sergeant McClaine that Deputy Warden ordered the extraction team to wait for his arrival before entering the holding cell. Sergeant McClaine was then under the impression that

---

[16] The Incident Management System is utilized to provide an organized and prompt response to emergent situations that arise at prison complexes. When an IMS is activated, a recorder at the control station records in writing all radio broadcasts in order to keep as accurate a record of the timeline of the incident as possible. During this IMS, a video recording was taken. Unfortunately, the majority of the recording was inaudible, thus overall, the Court was unable to decipher what and by whom things were being said. Furthermore, the camera focused primarily on Aaron, thus anyone viewing the recording is, for the most part, unable to identify the individuals on the scene. The caveat, however, is Sergeant McClaine's report made directly to the camera, which is discussed throughout this order.

[17] IMS procedures call for various individuals to be assigned to different teams. "A-Team" responders are the first responders in a given situation. If additional responders are necessary, the incident commander will activate the "B-Team" and so forth and so on.

[18] See FN 15.

– 13 –

Deputy Warden Tucker had more information about Aaron than the information to which he was privy. The foregoing events, such as the phone call and Gutierrez's observation were not shown on video because the video was focused on the inside of the holding cell. However, the events are supported by testimony in the record.

At 0828 hours, Shaw returned to the holding cell area with a water cannon which Lechuga used on Aaron. This was recorded on the IMS video. There was still no response from Aaron. He remained lying down in the same position. The IMS video then focused on Aaron's upper body while the A-Team responders went to the staging area down the hall from the holding cell to suit up with elbow and knee pads, a stab vest, helmet and visor, and a shield-all pursuant to ADC policy.[19]

At 0835 hours, the IMS video shows that the A-Team was suited up and briefed. At approximately the same time, Sergeant McClaine reported the status of the events directly to the camera.[20] At 0836 hours, Deputy Warden Tucker arrived on the scene and authorized the A-Team to enter the holding cell for the removal of Aaron. The IMS recording supports the testimony of the officers that at 0836, the A-Team entered the holding cell, and pursuant to ADC policy, they restrained Aaron and removed him from the cell. Aaron was then placed on a gurney for immediate medical examination. This was all recorded on the IMS video. Nurses Gutierrez and Maroni performed the medical evaluation immediately after the extraction was complete. The video also shows one of the officers placing a blanket over what appears to be Aaron's mid-section. Lead nurse Maroni reports finding agonal carotid pulse. At the direction of Maroni, Aaron was taken to the Health Unit at 0839 hours. Upon

---

[19] As noted, inmates have feigned unconsciousness or unconscious-like conduct in order to commence fights with staff. Furthermore, Aaron had a history and of aggressive and violent behavior toward the staff and had previously been found with a homemade weapon.

[20] Sergeant McClaine's report to the camera occurred prior to the cell extraction and was audible on the IMS video. His statements supported his as well as the other officers' testimony that they believed **Aaron was alive and breathing**.

arrival at the Health Unit, the health care provider[21] noted that Aaron was nonresponsive, had no heartbeat, and no respiration. According to the video, he checked Aaron and ordered an electrocardiogram (EKG)[22]. Maroni prepared the EKG. The health care provider then ordered the lights to be turned off to administer the test. After the outcome of the test, at 0843, Aaron was pronounced dead.

The Criminal Investigation Unit

Criminal Investigations Unit ("CIU") Investigator Russell Brodeur ("Brodeur") is currently employed as a Special Investigator at the ADC. Brodeur has attended many classes pertaining to examining corpses to recognize physiological changes resulting from death, including lividity. Brodeur understands the importance of the absence or presence of lividity at the time of initial observation of a deceased body in determining the time of death.

On May 12, 2005, Brodeur received a call at 0837 hours reporting a nonresponsive inmate at SMU I. He was assigned as lead investigator and while preparing to leave for SMU I, he received a call advising him that the inmate had died. At approximately 0859 hours, Brodeur arrived at SMU I Health Unit accompanied by special investigators Abe Kakar ("Kakar") and Pablo Hernandez ("Hernandez"). Brodeur briefed them on Aaron's suicide and the events surrounding the suicide. Brodeur took the blanket from Aaron's body and visually observed lividity on the right side of Aaron's chest, on his stomach, and on his leg. All of this information was noted in his written report. Simultaneously, Kakar used a 35mm camera to photograph Aaron's body. According to the undisputed evidence, the photographic process took no more than ten minutes. Brodeur subsequently reviewed the photographs and found them to be true and accurate depictions of his observations of Aaron's body at approximately 0900 hours on May 12, 2005.

---

[21] The health care provider is believed to be Dr. Strubeck.

[22] An electrocardiogram is a test that detects and records the heart's electrical activity. *U.S. Dep't of Health and Human Services, National Institute of Health.*(Nov. 2008).

- 15 -

At approximately 0931 hours, Brodeur arrived at the holding cell and concluded that the position of Aaron's body in the cell was consistent with the location of lividity he had observed on Aaron's body. While at the holding cell, Brodeur confiscated the observation record logs as evidence. He took the logs to the evidence room where they have remained. Aaron's body was transported to Pima County Medical Examiner's Office for an autopsy.

The Medical Examiner's Findings and Dr. Spitz's Opinions

The autopsy revealed that Aaron had committed suicide by "shoving toilet paper into his mouth." Dr. Diane Karluk ("Dr. Karluk"), the medical examiner, concluded, "[t]he death of this man is due to *complete occlusion* of his upper airway by a large wad of toilet paper. He was apparently suicidal and had been placed in a single cell under suicide watch. The manner of death is suicide." (Emphasis added). Dr. Karluk found that the toilet paper wad was located in the larynx area (upper airway) and explained that *a person looking into another person's mouth would not be able to see the larynx without a tool such as a laryngoscope. It is undisputed that the ADC medical staff was not equipped with a laryngoscope and had no experience using such a tool.*

Plaintiff retained Daniel J. Spitz, M.D., ("Dr. Spitz") a pathologist and medical examiner as an expert in this matter to formulate opinions regarding the cause of Aaron's death and to evaluate the circumstances under which he died. Specifically, Dr. Spitz testified that rigor mortis[23] would appear faster in smaller muscles, such as Aaron's jaw muscles, than it would in other areas. Dr. Spitz agreed with Dr. Karluk that the cause of death was asphyxiation secondary to the obstruction of the upper airway by toilet paper.[24] Dr. Spitz also agreed with Dr. Karluk's conclusion that the toilet paper wad was located in the larynx

---

[23] Dr. Spitz defined rigor mortis as "the stiffening of muscles after death." He explained that rigor mortis occurs faster in smaller muscle groups than larger ones and the typical time for onset of rigor mortis is thirty minutes to an hour after death.

[24] Dr. Spitz speculated that Aaron could have had a partial occlusion at some point in time. However, he provided no evidence to that effect. It amounted to mere conjecture.

area and that a person looking into another person's mouth would not be able to see the larynx without a tool such as a laryngoscope. He acknowledged that when evaluating Aaron, Maroni was unable to open Aaron's jaw. Dr. Spitz opined that it would take approximately one hour for rigidity to set in to the point when someone would be unable to open Aaron's jaw.

Dr. Spitz further acknowledged that Dr. Strubeck found dependent lividity[25] on Aaron's buttocks including streaks or lines of red discoloration. Based on Dr. Strubeck's observation of lividity at 0843 hours, and Dr. Spitz's opinion that lividity takes approximately an hour to appear, Dr. Spitz testified that Aaron had to have been deceased for longer than forty-five minutes at the time of observation. During his October 20, 2008 deposition, Dr. Spitz reviewed for the first time photographs taken of Aaron's body at 0900 hours on May 12, 2005. He testified that the photographs depicted reddish discoloration consistent with lividity that would occur within about an hour of the time of death. He then agreed that based on that evidence, Aaron most likely died between 0800 hours and 0815 hours, if not earlier.

The Administrative Investigation Unit

The ADC's Administrative Investigation Unit ("AIU") conducted an internal investigation of the foregoing events.[26] During the course of the investigation and pursuant to standard policy, all relevant documents, including correctional officers' logs, were seized and maintained as evidence. On May 3, 2007, the AIU completed its investigation and issued a final Administrative Investigation Report. The AIU determined that the allegations

---

[25] Dr. Spitz defined livor mortis, or lividity, as the "pooling of blood after death." He explained that it occurs in the dependent portions of the body essentially affected by gravity. Lividity manifests as reddish, purple discoloration of the skin. The onset of lividity is similar to rigor mortis and may occur as soon as 30 minutes after the time of death.

[26] The purpose of an AIU investigation is to determine whether any staff misconduct occurred and to make recommendations for review and disposition by the approving authorities.

1  of policy violations against Officers Lechuga and Shaw, and Sergeants McClaine and

2  Carlson were unsustained.

3  **II.   LEGAL STANDARD AND ANALYSIS**

4       The standard for summary judgment is set forth in Rule 56(c) of the Federal Rules of Civil

5  Civil Procedure.  Under this rule, summary judgment is properly granted when, after viewing

6  the evidence in the light most favorable to the non-moving party, no genuine issues of

7  material fact remain for trial.  Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-

8  23 (1986); <u>Eisenberg v. Ins. Co. of N. Am.</u>, 815 F.2d 1285, 1288-89 (9th Cir. 1987).

9       The moving party bears the burden of demonstrating that it is entitled to summary

10  judgment.  <u>Mur-ray Mgmt. Corp. v. Founders Title Co.</u>, 819 P.2d 1003, 1005 (Ariz. Ct.  App.

11  1991).  If the moving party makes a <u>prima</u> <u>facie</u> case showing that no genuine issue of

12  material fact exists, the burden shifts to the opposing party to produce sufficient competent

13  evidence to show that a triable issue of fact does remain.  <u>Ancell v. United Station Assocs.,</u>

14  <u>Inc.</u>, 803 P.2d 450, 452 (Ariz. Ct. App. 1990).  The Court must regard as true the non-moving

15  party's evidence, if it is supported by affidavits or other evidentiary material.  <u>Celotex</u>, 477

16  U.S. at 324. However, the non-moving party may not merely rest on its pleadings, it must

17  produce some significant probative evidence tending to contradict the moving party's

18  allegations and thereby creating a material question of fact.  <u>Anderson v.  Liberty Lobby,</u>

19  <u>Inc.</u>, 477 U.S. 242, 256-57(1986)(holding that the plaintiff must present affirmative evidence

20  in order to defeat a properly supported motion for summary judgment); <u>First Nat'l Bank of</u>

21  <u>Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968).

22  A.     Eighth Amendment Claims on Behalf of Aaron and Barbara Patterson

23       In determining the existence of deliberate indifference, a court must consider the

24  seriousness of the prisoner's medical need and the nature of the specific defendant's response

25  to that need." <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other*

26  *grounds by* <u>WMX Techs, Inc. v. Miller</u>, 104 F.3d 1133, 1136 (9th Cir 1997).  Plaintiff must

27  show that a defendant "purposefully ignored or failed to respond to his pain or possible

28

medical need." Id. at 1060. In Farmer v. Brennan, 511 U.S. 825, 837 (1994), the Supreme Court instructs that the state of mind of the defendant is to be viewed from a *subjective*, rather than objective viewpoint. (Emphasis added.) Based upon the Farmer standard, the Ninth Circuit explained, "[o]nly if the person 'knows of and disregards an excessive risk to inmate health and safety.' . . . it is not enough that the person merely 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *he must also draw that inference*.' If a person *should have been aware* of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk." See Gibson v. County of Washoe, 290 F.3d 1175, 1187-88 (9th Cir. 2002) (quoting Farmer, 511 U.S. at 837, citing Jeffers v. Gomez, 267 F.3d 895, 914 (9th Cir. 2001))(emphasis added).

Furthermore, in civil rights actions, the Ninth Circuit requires proof of causation. "A person deprives another of a constitutional right within the meaning of Section 1983 if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains]." Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988) (quoting Johnson v. Duffy, 588 F.2d 40, 743 (9th Cir. 1978))(emphasis added). For a prisoner to prevail on a civil rights claim under 42 U.S.C. § 1983 based on the allegation of inadequate medical care in violation of the Eighth Amendment, the prisoner must establish that the *individual defendant caused* "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). Moreover, the court must focus on whether the individual defendant was in a position to take steps to avert additional harm, but failed to do so intentionally or with deliberate indifference. Leer, 844 F.2d at 633-34 (internal citations omitted). The Court will now address Plaintiff's specific claims against each individual defendant.

1. Nurse Gutierrez

Plaintiff alleges that Gutierrez, a licensed practical nurse employed by ADC, was deliberately indifferent to the serious medical needs of Aaron in violation of his Eighth

Amendment rights. To prevail on her Eighth Amendment claims, Plaintiff must establish that Gutierrez was deliberately indifferent to Aaron's medical needs *and* that such deliberate indifference was the cause of Aaron's death.

Plaintiff contends that more timely intervention by Gutierrez could have prevented Aaron's death. As the record reflects, Gutierrez testified that immediately upon arriving at the scene and observing Aaron, he opined that Aaron was alive and breathing.[27] Based on this belief, he did not perceive a medical emergency existed. Plaintiff has failed to proffer evidence to raise a genuine issue of material fact contradicting Gutierrez's belief that Aaron was not in serious medical distress. Moreover, in the factual narrative provided by Plaintiff, she concedes that shortly after arriving at the scene, Gutierrez is heard saying, "[h]e's breathing" followed by the statement "[t]hat's a good sign." While poor medical treatment may at some point rise to the level of a constitutional violation, malpractice, or even gross negligence does not suffice for a claim of deliberate indifference. Estelle, 429 U.S. at 106; see also Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) ("Mere medical malpractice does not constitute cruel and unusual punishment.")(citation omitted); see also Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir.1990). Plaintiff has failed to satisfy her burden of establishing that Gutierrez was deliberately indifferent to Aaron's medical needs based on the timing of his intervention. Based upon Gutierrez's subjective state of mind, he cannot be held liable for a violation of Aaron's Eighth Amendment rights based upon on this particular allegation. Farmer, 511 U.S. at 837; Leer, 844 F.2d at 633.

Plaintiff's next argument is that Gutierrez *should have known* there was a substantial risk to Aaron's health at the time he arrived on the scene merely by virtue of being called to the scene. However, this is not the standard promulgated by Farmer, 511 U.S. at 837, nor is it the standard set forth by the Ninth Circuit in Gibson, 290 F.3d at 1187-88 (Even if a

---

[27] The other Defendants on the scene also believed Aaron was breathing while he was in the holding cell. Moreover, Nurse Maroni, an experienced nurse, opined that she had detected an agonal pulse.

person should have been aware of the risk, but was not, the person was not in violation of the Eighth Amendment.)  Consequently, Patterson's argument fails.  Gutierrez cannot, as a matter of law, be liable under the Eighth Amendment for not knowing the risk.  Id.

Next, Plaintiff avers that Gutierrez was deliberately indifferent to Aaron's medical needs by not attempting to resuscitate Aaron.  This Court disagrees.  It is undisputed that it is the policy of the ADC that medical staff may not physically examine an inmate, including efforts to resuscitate, until the inmate has been extracted from the cell.  According to the undisputed testimony of both Gutierrez and Sergeant McClaine, as well as footage from the IMS video, Gutierrez examined Aaron immediately upon his removal from the holding cell. Nurses Gutierrez and Maroni checked for a heart beat and respiration. Gutierrez testified that he then prepared to begin CPR.  However, immediately after the initial examination, Maroni directed that Aaron be taken to the Health Unit. Maroni had the higher nursing license and was the appropriate nurse to make that decision.  The undisputed testimony provided by Gutierrez's nursing expert confirmed that his deference to Maroni under those circumstances is consistent with the applicable standard of care.  This supports the conclusion that Gutierrez was not in the position to avert any alleged further injury to Aaron.  Leer, 844 F.2d at 634.  Therefore, he could not, as a matter of law, have been the cause of injury to or death of Aaron.  Id.  Likewise, he cannot be held liable for an Eighth Amendment violation for deliberate indifference to Aaron's medical needs for not attempting to resuscitate Aaron.

Plaintiff further argues that Gutierrez was deliberately indifferent to Aaron's medical needs by not acting with more of a sense of urgency.  As the Court has previously addressed, medical staff is not permitted to physically examine inmates until after they have been extracted from the cell by security officers.  Pursuant to the order of the Deputy Warden, the extraction was not permitted until he arrived on the scene.[28]  According to the Supreme

---

[28]  An example of Gutierrez not being in a position to avert any alleged further injury to Aaron.  Leer, 844 F.2d at 634.

- 21 -

Court, prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment, are necessary to preserve internal order and discipline, and to maintain institutional security. Whitley v. Albers, 475 U.S. 312, 321-22 (1986). Gutierrez did not have the authority to physically examine Aaron any sooner than he did and hence was not in a position to avert injury to Aaron. Leer, 844 F.2d at 633-34. Therefore, Gutierrez's alleged failure to act with more urgency could not have been the legal cause of any alleged further injury to or death of Aaron. Id. Thus, he cannot be held liable for an Eighth Amendment violation for deliberate indifference for failure to act with more urgency.

Plaintiff was unable to satisfy the subjective component of the deliberate indifference standard. Moreover, she was unable to establish that Gutierrez's actions or inactions were the cause of death or injury to Aaron. Therefore, Gutierrez is entitled to summary judgment in his favor as to all allegations of Eighth Amendment violations.

2.      The Officers

The Court will not reiterate the specific components of the deliberate indifference standard or the requirement for individual causation for each defendant. However, for the sake of clarity, the Court will briefly set forth what is necessary for a plaintiff to successfully establish a 42 U.S.C. § 1983 civil rights claim against individual state officials. State officials are not subject to suit under 42 U.S.C. § 1983 unless they are alleged to have played an affirmative part in depriving a plaintiff of his constitutional rights. Rizzo v. Goode, 423 U.S. 362, 377. Furthermore, the inquiry into causation *must be individualized and focus on the responsibilities of each defendant* whose acts or omissions are alleged to have caused a constitutional deprivation. Rizzo, 423 U.S. at 377; Leer, 844 F.2d at 633; King v. Atiyeh, 814 F.2d 565, 568 (9th Cir. 1987). A plaintiff must prove that *each individual official* acted with deliberate indifference and that this deliberate indifference was the legal cause of the deprivation of the inmate's Eighth Amendment right to be free from cruel and unusual

1  punishment. <u>Leer</u>, 844 F.2d at 634.[29]

2      In <u>Gibson v. County of Washoe, Nev.</u>, the Ninth Circuit agreed that the subjective
3  component of <u>Farmer</u>'s deliberate indifference standard could be met if the risk involved was
4  *obvious*, but determined that Gibson's condition was not so obvious that the security officers
5  involved could be found liable. <u>Gibson</u>, 290 F.3d at 1196-97.  Inmate Gibson died of a heart
6  attack after struggling with officers who were trying to restrain him. <u>Id</u>. at 1183.  Gibson was
7  seriously mentally ill and took medication for manic depressive order. <u>Id</u>. at 1180.  His
8  widow alleged that the officers were deliberately indifferent to her husband's mental state.
9  <u>Id</u>. Despite evidence of extreme mood swings and dramatic shifts from compliance and
10 combatance, the Ninth Circuit found that the security officers did not have *actual knowledge*
11 of the prisoner's specific mental condition and that with no training regarding the diagnosis
12 and treatment of mental illness, a jury could not find that the prisoner was so obviously
13 mentally ill that the officers could be held liable under the deliberate indifference standard.
14 <u>Id</u>. at 1197.  In the instant case, like in <u>Gibson</u>, the Defendants *are not trained regarding the*
15 *mental health, diagnoses, medications, treatment plans, or the specific mental illness of the*
16 *prisoners*. Accordingly, a jury could not find that the officers could *know* that Aaron was *so*
17 *obviously mentally ill* that he would commit suicide by shoving toilet paper down his throat.
18 Therefore, as in <u>Gibson</u>,  a jury could not find that the officers and sergeants could be held
19 liable under a deliberate indifference standard for violations of the Eighth Amendment. <u>Id</u>.
20 at 1197.  Notwithstanding, this Court will take a more individualized approach to come to
21 its decision.

22          a.      Officer Shaw

23      Plaintiff claims that Shaw violated Aaron's rights under the Eighth Amendment
24 because he was deliberately indifferent to Aaron's medical needs by not recognizing sooner
25 that Aaron was in serious medical distress.  It is undisputed that Shaw first observed Aaron

26

27      [29] For a more detailed analysis of the deliberate indifference standard, <u>see</u>  <u>supra</u>.

28

at approximately 0650 hours, at which time he stated unequivocally that *he believed* Aaron was breathing. He did not believe that Aaron was in any medical distress. Based on Shaw's subjective belief, and pursuant to the law set forth in Farmer and its progeny, Shaw cannot be held liable for not responding earlier to Aaron. See Farmer, 511 U.S. at 837; Gibson, 290 F.3d at 1196-97.

Next, Plaintiff argues that Shaw has no "reasonable" explanation as to how he could "fail to be concerned with an inmate naked on the cement floor who is virtually motionless." First, the Court reminds Plaintiff that it is not she who decides whether Shaw's conduct is reasonable. Second, deliberate indifference is not comprised of a reasonableness standard. As previously articulated by this Court, to establish deliberate indifference, Plaintiff must demonstrate that Shaw's "failure to be concerned" was intentional, purposeful, and deliberate, and was the actual and proximate cause of the deprivation of his Eighth Amendment right. In other words, Plaintiff must satisfy the test for deliberate indifference, beginning with the subjective component set forth in Farmer. See Farmer, 511 U.S. at 837. As stated, Shaw believed Aaron was alive and breathing, hence his steadfast belief that Aaron was not in medical distress. Plaintiff has failed to present evidence to establish that Shaw *knew* Aaron was dying and intentionally left him to suffer. To the contrary, the evidence demonstrates the Shaw had no reason to believe that Aaron's conduct on May 12, 2005 was any different to Aaron's conduct any other day he spent lying in the same or similar position in the holding cell.[30] Having established Shaw's subjective belief, the Court could essentially stop its inquiry. However, it will briefly address the issue of causation. Plaintiff has failed to proffer evidence establishing that any *specific action or*

---

[30] Even assuming Shaw *should have known* there was something particularly different about Aaron that day, the law dictates that he cannot be held liable for an Eighth Amendment violation. Gibson, 290 F.3d 1187-88. As unfortunate as the circumstances are, and the Court acknowledges that this is an extremely sad situation for Patterson, the Court is bound by the standards set forth by the Supreme Court and the Ninth Circuit.

*inaction* on the part of Shaw observing Aaron lying naked on the floor of the holding cell *caused* the death of Aaron. Leer, 844 F.2d at 633.

Plaintiff's next allegation against Shaw is that immediately upon realizing that Aaron was not responding to him, Shaw should have initiated an IMS. She contends that such a delay in medical treatment amounted to deliberate indifference in violation of his Eighth Amendment rights. Prison officials are deliberately indifferent to a prisoner's serious medical needs when they delay or intentionally interfere with medical treatment and such delay caused substantial harm. Wood, 900 F.2d at 1334-35 (citing Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir.1988)). Here, Plaintiff has not provided evidence establishing that Shaw, as an individual, denied, delayed, or intentionally interfered with medical treatment for Aaron. The assertion that the IMS should have been initiated earlier is an argument that is essentially directed at the ADC's policies. It appears that it is Plaintiff's position that the ADC policies in effect at the relevant times were insufficient. However, Plaintiff's specific claim is against Shaw, not against the ADC.[31] The premise of her argument is that Shaw should not have retrieved the water cannon or tried to elicit a response from Aaron in any manner. Without any evidentiary support, she concludes that Shaw should have immediately initiated an IMS. After a review of the record, there is no deposition testimony by anyone at the scene stating that they believed Aaron was in medical distress. No one observed Aaron attempt to place or actually place anything in his mouth. There were no signs that he had been choking or struggling for breath.[32] It is undisputed that Shaw first became aware of

---

[31] Similarly, Patterson concludes that shooting water at Aaron was done for security purposes as opposed to addressing Aaron's "serious medical needs." Testimony establishes that none of the Defendants believed that Aaron had any serious medical needs. Furthermore, the officers' attempt at trying to elicit a response via calling out Aaron's name, knocking on the door, and spraying the water cannon prior to suiting up and performing a cell extraction is ADC protocol. Therefore, this is an issue that Plaintiff has with the ADC, not with the individual Defendants.

[32] It seems evident that based on Plaintiff's argument, she summarily concludes that an IMS should be initiated whenever an inmate is nonresponsive. This is not an issue

Aaron's nonresponsiveness when Grassman stopped at the holding cell at approximately 0810 hours. Furthermore, Grassman testified that as soon as Shaw (and Lechuga) were alerted by him, both officers immediately "opened the food trap, and they both got down and looked in, and yeah, *they were right on it."* He further stated that they opened the food trap "faster than within a half a minute."

Based on the aforementioned, the Court finds that Patterson has failed to present evidence establishing that Shaw's individual actions or inactions "den[ied], delay[ed], or intentionally interfere[d] with [Aaron's] medical treatment." Hallett, 296 F.3d at 744 (citation omitted); Wood, 900 F.2d 1334. Moreover, critical to the outcome of Patterson's allegation that Shaw "delayed medical treatment for her son" by not initiating an earlier IMS is Deputy Warden's order prohibiting Aaron's extraction from the holding cell until he arrived on the scene. Regardless of when an IMS was called, the extraction would not have occurred until the arrival of the Deputy Warden.

Possibly most significant regarding initiating an earlier IMS is the following, which applies to *all Defendants*. The medical examiner's findings established that the ADC medical staff would not have been equipped to extract the occlusion from Aaron's airway despite an earlier extraction from his holding cell. Based on this evidence, none of the medical staff nor security staff could have done anything to prevent further injury or harm to Aaron. Thus, *none of the Defendants* were in a position to take steps to avert additional harm, yet failed to do so intentionally or with deliberate indifference. Leer, 844 F.2d at 633-34 (internal citations omitted). Accordingly, Plaintiff's assertions that Shaw's failure to initiate an IMS *caused* Aaron's death or additional injury to Aaron must fail as a matter of law. Id. Thus, Shaw cannot be held liable for an Eighth Amendment violation for deliberate indifference for failing to initiate an IMS.

---

currently before the Court. Furthermore, it is not a claim to be alleged against the individual Defendants, rather, this pertains to her underlying issues with the ADC policies as they relate to the IMS process.

b.    Officer Lechuga

Plaintiff's claims against Lechuga are strikingly similar and often overlap with her claims against Shaw. Plaintiff argues that Lechuga also violated Aaron's Eighth Amendment rights by denying Aaron more timely medical care. It is undisputed that Lechuga believed that Aaron was not in medical distress during the time that he and Shaw were attempting to elicit a response from Aaron. Such undisputed testimony clearly establishes Lechuga's state of mind, a necessary component of the deliberate indifference standard. Farmer, 511 U.S. at 837.

Plaintiff further argues that Lechuga *should have known* that something was wrong with Aaron because he (and Shaw) spent a lot of time with the inmates. Based on the clear legal authority set forth above, the Court could summarily dismiss this argument, as it was directed at both Shaw and Lechuga, without an individualized focus. Instead, the Court will dispose of the argument on its merits. One can deduce from the cell-front logs that Lechuga was in fact quite familiar with Aaron's propensity to lie down quietly in the holding cell-particularly in the position in which he was found. He was also familiar with Aaron's prior inclination to sleep through the day until dinner. All of this, however, supports the finding that Lechuga's action or inaction did not amount to deliberate indifference to Aaron's medical health. As established, the deliberate indifference standard is not comprised of a "should have known" component. See supra. The Court recognizes the sensitive nature of the pending issues, however, it is bound by the standard of the law, and deliberate indifference requires that the defendant *knew of* and intentionally disregarded the excessive risk to the inmate's health and safety. See Farmer, 511 U.S. at 837; See also Gibson, 290 F.3d at1187-88.

Another argument set forth by Plaintiff is that Lechuga, like the other officers, should have initiated an IMS as soon as he knew that Aaron was unresponsive. Without being

redundant, the Court will briefly address this issue.[33]  By the time that it was established that Aaron was unresponsive, there were several officers and sergeants on the scene.  Thus, as a correctional officer surrounded by superior officers, Lechuga would not have initiated an IMS in lieu of a higher ranking officer initiating the IMS.  Furthermore, there are ADC policies in place to ensure that initiating an IMS is appropriate, including, but not limited to, first calling out to an inmate, banging on the cell door, throwing water into the cell, and spraying a water cannon into the cell.  Such attempts at eliciting a response are not arbitrary at the ADC.  Specifically with regard to Lechuga, he made constant attempts at eliciting a response from Aaron beginning from the time he was aware that Aaron was not responding to Grassman.  See Supra.  However, Lechuga was not in a position to take steps to avoid injury to Aaron.  Lechuga was not permitted to enter Aaron's cell until the arrival of Deputy Warden Tucker.  Therefore,  an earlier IMS would have proven futile.

Finally, Plaintiff makes a sweeping conclusion, with no evidence to support it, that Lechuga (as well as others)  knew that Aaron was unresponsive, had no weapon, and that immediate extraction was necessary.  Again, this could be summarily disposed of because of the lack of individualized focus as to each individual defendant.  Leer, 844 F.2d at 633-34.  Patterson maintains that such inaction amounted to deliberate indifference.  The record establishes the contrary. Aaron had a history of aggressive behavior, had a disciplinary history of assaults against security staff, and had been found with a homemade weapon on a previous occasion.  Furthermore, "[s]weeping conclusory allegations will not suffice to prevent summary judgment. The prisoner must set forth specific facts as to each individual defendant's deliberate indifference."  Leer, 844 F.2d at 633-34.  Plaintiff has failed to demonstrate that Lechuga knew that an immediate extraction was necessary and intentionally

---

[33] The Court is mindful that it has previously found that none of the Defendants are liable for deliberate indifference for failing to initiate an earlier IMS based upon the medical examiner's finding that the ADC medical staff would not have been equipped to extract the occlusion from Aaron's airway despite an earlier removal of Aaron from his holding cell.

1  failed to act there upon.

2          c.    Sergeant McClaine

3      Plaintiff claims that Defendant McClaine also violated Aaron's rights under the Eighth

4  Amendment by denying him timely medical care by virtue of not initiating an earlier IMS.[34]

5  Upon arriving on the scene, Sergeant McClaine noticed Officers Shaw and Lechuga

6  attempting to get a response from Aaron. Sergeant McClaine called out Aaron's name,

7  banged on the cell, and directed Lechuga to spray Aaron with a water cannon. This was all

8  part of a routine course of action meant to achieve an intended result from a nonresponsive

9  inmate. After not receiving a response to any of their attempts, Sergeant McClaine initiated

10  an IMS.   The  IMS video clearly shows Sergeant McClaine reporting to the camera that

11  Aaron was breathing.[35]   During his deposition, Sergeant McClaine testified that upon

12  observing Aaron in the holding cell, he *believed* that Aaron was breathing.  Plaintiff has

13  failed to proffer evidence to the contrary.  Therefore she is unable to satisfy her burden set

14  forth by the Supreme Court and the Ninth Circuit.  <u>Farmer</u>, 511 U.S. at 837; <u>Gibson</u>, 290

15  F.3d at 1187-88.  Accordingly, based on Sergeant McClaine's subjective belief, he  cannot

16  be held liable under the Eighth Amendment for deliberate indifference for failure to provide

17  timely medical care by failing to initiate an earlier IMS.

18      Plaintiff's next point of contention is that as incident commander, Sergeant McClaine

19  should have recognized the medical emergency and disregarded Deputy Warden Tucker's

20  order prohibiting the cell extraction until his arrival.  In particular, she argues that Sergeant

21  McClaine *knew or should have known* that pursuant to General Order No. A08-100-10

22  regarding suicide prevention in SMU I, he had the ability to override the Deputy Warden in

23  certain situations.  General Order No. A08-100-10 states in pertinent part, "*…when obvious*

24

25      [34] <u>See</u> FN 33.

26      [35] Whether his statement was accurate is irrelevant under the deliberate indifference
27  standard, as it is based on his subjective belief that Aaron was breathing at the time.
   <u>Farmer</u>, 511 U.S. at 837.

28

*signs of suicide paraphernalia are present in conjunction with an unresponsive inmate*, staff must immediately change tactics..."  Significantly, the Court notes that Plaintiff has failed to articulate any "obvious signs of suicide paraphernalia." To the contrary, no one knew that Aaron was provided with the toilet paper he had used to commit suicide.  He had no clothing, sheets, toilet paper, or any other "paraphernalia" near or around him that could be used to alert any of the officers of such a situation.  The Court finds that Sergeant McClaine would have had no reason to override an order from his superior when (1) his subjective belief was that Aaron was not  in serious medical distress; (2) the circumstances did not fit within the parameters of those enumerated in the General Order; and (3) as testified to, Sergeant McClaine believed that based upon Deputy Warden Tucker's order, the Warden had more information regarding Aaron than the information to which he was privy. Based upon the foregoing, Plaintiff has failed to establish that Sergeant McClaine's  decision not to override Deputy Warden's order and his action or inaction as incident commander caused further injury to or the death of  Aaron.  <u>Leer</u>, 844 F.2d at 633.

        d.    Sergeant Carlson

Plaintiff's arguments against Sergeant Carlson were primarily a melange of arguments asserted against the "officers" in general.  However, there is an exception.  Plaintiff specifically argues that "it strains belief that an individual could have such shallow breathing that Carlson imagined it without 'any obvious signs [of] medical distress.'" As previously articulated, such conclusory statements are without merit.  <u>Leer</u>, 844 F.2d at 633-34. (Conclusory allegations are not sufficient to prevent summary judgment. A prisoner must set forth specific facts as to each individual defendant's deliberate indifference.)  <u>Id</u>.  As established, Sergeant Carlson and other officers all testified that they believed that Aaron was alive and breathing when they observed him in the holding cell.  They did not believe that there was an emergency situation or that Aaron was in medical distress.  Plaintiff has proffered no evidence to contradict their testimony nor has she alleged any specific conduct on the part of Sergeant Carlson amounting to deliberate indifference.  Plaintiff has further

failed to establish that Sergeant Carlson's actions or inaction were the cause of injury to or the death of Aaron.

B.     Aaron Patterson's Fourteenth Amendment Claim

In her Complaint, Plaintiff claims that "[a]s a direct result of Defendants' deliberate and unconstitutional conduct, Aaron Patterson died."  Specifically regarding her Fourteenth Amendment claim on behalf of Aaron, Plaintiff contends only that "Defendants' conduct, including that of literally standing and watching Aaron die, 'shocks the conscience' and as such, violates substantive due process."  The Court has determined that the conduct of the officials did not reach the level of deliberate indifference.  Pursuant to the Ninth Circuit, the "deliberate difference" standard is a subset of the "shocks the conscience" standard.  Porter v. Osborn, 546 F.3d 1131, 1137 (2008).  Furthermore, the Supreme Court has expressly stated that only official conduct that "shocks the conscience" is cognizable as a due process violation.  Lewis, 523 U.S. at 846, 118 S.Ct. 1708 (citing Rochin v. California, 342 U.S. 165, 172-73, 72 S.Ct. 205, 96 L.Ed. 183 (1952)).  Having found that Plaintiff has failed to establish that any of the individual Defendants' conduct amounted to deliberate indifference, a 'shocks the conscience' claim against any of them must fail as a matter of law.

The Court acknowledges that the instant circumstances are well beyond the realm of unfortunate.  It is without any question, far beyond the normal course of nature for a parent to cope with her own child's death.  However, it is both the role and the duty of this Court to base it's decisions strictly on the law.  In the instant matter, none of the Defendants had the requisite state of mind to satisfy the subjective component of the deliberate indifference standard set forth by the United Stated Supreme Court and the Ninth Circuit Court of Appeals.  Furthermore, Plaintiff was unable to satisfy the Ninth Circuit's causation requirement for any and all individual defendants in 42 U.S.C. § 1983 civil rights actions.  Accordingly, the Defendants are entitled to summary judgment in their favor on all claims alleged under the Eighth Amendment on behalf of Aaron and Plaintiff and all claims alleged under the Fourteenth Amendment on behalf of Aaron.

C.    Barbara Patterson's Fourteenth Amendment Claim

Patterson alleges that the conduct of the Defendants "violated (her) rights under the Fourteenth Amendment to a continued familial relationship" with Aaron. Defendants argue that Patterson's claim should be dismissed because relief for a claim such as this "should be limited to situations in which the child involved is a minor." Plaintiff's response, in its entirety, consists of the following[36]:

> Defendants also seek dismissal of Ms. Patterson's personal claim under the 14th Amendment. As Defendants have acknowledged, this Court is bound by the Ninth Circuit authority to the contrary. Therefore, Plaintiff will not address the merits of the argument. Should the Court elect to break new legal ground, Plaintiff requests the opportunity to brief the merits.

"It is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child and that the state's interference with that liberty interest without due process of law is remediable under 42 U.S.C. § 1983." Lee v. City of Los Angeles, 250 F.3d 668, 685 (9th Cir.2001) (citation, alterations, and internal quotation marks omitted). However, for the same reasons that Plaintiff's Eighth Amendment deliberate indifference claims fail, her due process claims must also fail. "[L]iability for *negligently inflicted harm is categorically beneath the threshold of constitutional due process*." County of Sacramento v. Lewis, 523 U.S. 833, 849(1998)(citations omitted)(emphasis added); Daniels v. Williams, 474 U.S. 327 (1986)(The Supreme Court ruled that the "Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property." A due process claim *requires a showing of more than negligence*. Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004)(emphasis added). The

---

[36] Although the Court does not "elect to break new legal ground," the Court does find said response to lack any substance whatsoever. Plaintiff's counsel presumes that this Court is responsible for (1) briefing the issue for Plaintiff, including the relevant law and factual analysis necessary to determine the outcome or (2) deciding the issue without adequate briefing. Such bare allegations and presumptuous expectations do not reach the standard that is acceptable to this Court.

Court finds that Plaintiff has failed to satisfy the necessary threshold to establish a Fourteenth Amendment due process claim based upon the violation of a parent's liberty interest in the companionship of her child. Defendants are entitled to summary judgment in their favor as to Patterson's Fourteenth Amendment Claim.

Accordingly,

IT IS HEREBY ORDERED GRANTING Summary Judgment on all claims in favor of Jesus Gutierrez. (Doc. 71.)

IT IS FURTHER ORDERED GRANTING Summary Judgment on all claims in favor of Defendants Matthew Shaw, Gavino Lechuga, John McClaine, and Ronald Carlson. (Doc. 72.)

DATED this 21st day of September, 2009.


Paul G. Rosenblatt
United States District Judge