**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Barbara Patterson, <br>     Plaintiff, <br> v. <br> Matthew Shaw, Dora Schriro, et al., <br>     Defendants. | No. CV 07-1476-PHX-PGR <br> **ORDER** |

On May 15, 2007, Barbara Patterson ("Plaintiff" or "Patterson") filed in Superior Court a 42 U.S.C. § 1983 civil rights Complaint alleging violations under the Eighth and Fourteenth Amendments of the United States Constitution. The sole remaining Defendant in the case is Jeanie Cooper ("Cooper"), a Psychology Associate II working at the Arizona Department of Corrections ("ADC") during the time Plaintiff's son Aaron was an inmate and committed suicide at the ADC.

In her Complaint, Plaintiff named Cooper as a defendant in her individual capacity. In paragraph 20 of her Complaint, Plaintiff alleged that during the Spring of 2005, Aaron received most of his mental health care treatment from Cooper. She further alleged that during the month of April, Aaron spent much of his time on suicide watch or mental health watch, alone in a small cell, naked, with no stimuli.[1] Although Plaintiff alleges that the ADC refused her visit on Mother's Day, the undisputed evidence demonstrates that Aaron was not on mental health watch that day, rather Aaron refused her visit, stating that he did

---

[1] The ADC policy regarding suicide and mental health watches is described in full detail below. See infra, p. 3-4.

not want to see her because she made him feel worse. Plaintiff then alleged that on May 10, 2005, Cooper placed Aaron back on mental health watch in deliberate indifference of his mental health needs. Cooper does not appear again in the Complaint. In her Answer to Plaintiff's Complaint, Cooper raised the defense of qualified immunity.

Patterson contends that Cooper's "deliberate indifference" in providing inadequate mental health care resulted in the death of Aaron in violation of his Eighth and Fourteenth Amendment rights. Plaintiff also alleges a substantive due process claim under the Fourteenth Amendment on her own behalf based on the loss of the life of her child and for the continued loss of her child's association.

Cooper filed the instant Motion for Summary Judgment wherein she asserts that she is entitled to qualified immunity. She further asserts that she was not deliberately indifferent to the medical (mental health) needs of Aaron Patterson. Plaintiff failed to file a Response to Cooper's Motion for Summary Judgment. Thereafter, Cooper did not file a Reply in support of her Motion for Summary Judgment.

I.  Factual Background[2]

In order to have a better understanding of the mental health policies at the ADC and whether or not they are considered "cruel and unusual" under the law, it is critical for the Court to begin by briefly discussing the class action case Casey v. Lewis, 834 F. Supp., 1477 (D. Ariz. 1993). In 1993, the District Court found that much of the ADC's mental health care of inmates did not meet constitutional standards. More specifically, the court found that the ADC "provides insufficient mental health programming at SMU," and that the "use of lockdown as an alternative to mental health care for inmates with serious mental illnesses clearly rises to the level of deliberate indifference to the serious mental health needs of the inmates and violates their constitutional rights to be free from cruel and unusual

---

[2] See (Doc. 112) for a complete factual background of this case, including Aaron's history of mental health and the relevant time he spent at the ADC. This order is limited to relevant facts related to Defendant Cooper.

- 2 -

punishment." Consequently, the Court entered an injunction ordering the ADC to "implement mental health policies and procedures that provide treatment services, trained and qualified mental health care staff, and facilities . . . to maintain adequate mental health care for seriously mental ill prisoners in keeping with professionally recognized health care standards." The Court appointed an expert psychiatrist.

In March of 1998, the expert filed her Final Report, noting her review of DO 1103. Among her findings were that "suicide and health and welfare watches were carried out in an appropriate manner;" "inmates are not being inappropriately locked down in lieu of treatment for serious mental

illnesses;" and "SMU II is the lockdown unit that can and does provide mental health treatment for those male prisoners who are seriously mentally ill and need a lockdown-type environment, usually because of their assaultive propensities secondary to or in addition to their mental illnesses."

Subsequently, the District Court Judge adopted the Report and Recommendation of the Magistrate Judge, which commended ADC's "mandatory requirement that any time there is a threat of suicide, or while someone is being evaluated regarding suicide, *they must be stripped down completely and placed on suicide watch*;" and found that "*(t)he overall mental health care system presently operating within the Arizona Department of Corrections complies with the requirements of the Eighth Amendment forbidding cruel and unusual punishment*. See Doc. 74.

Cooper and the ADC

Cooper has been a state-licensed Professional Counselor in Arizona since 2002. From November 2002 until September 2006, Cooper was employed by ADC as a Psychology Associate II in the Special Management Treatment Unit ("SMTU"). The undisputed evidence establishes that Cooper carried out her duties pursuant to "Director's Order 1103" ("DO 1103"). DO 1103 sets forth the ADC mental health treatment and policy, and it has remained continuously in effect from 1997 through the present.

- 3 -

Section 1103.07 authorizes "Suicide and Mental Health Watches." A suicide watch shall be authorized "when the inmate is acting self-destructively, attempting suicide, verbally threatening to commit suicide and/or to cause self-harm, or when there are situational warnings indicating an impending suicide attempt."[3] A mental health watch is authorized if the inmate is "demonstrating acute signs or symptoms of significant mental disorder but is not acting in a manner indicating considerable suicide risk."[4] Inmates placed on either a suicide or mental health watch shall be placed in their "own cell, a seclusion cell or another appropriate and secure location." Section 1103.07.1.7.4 and 8.4.

It is undisputed that it was Cooper's professional practice to consult with her supervising psychologist and obtain approval prior to placing an inmate on a watch, prior to changing a watch from mental health to suicide watch, or vice versa, and prior to taking an inmate off watch. She did not deviate from that practice.

In 2004-2005, Cooper worked at the SMTU, as part of a treatment team with two other psychology associates, one of whom was also a licensed Professional Counselor, and the other was a licensed social worker. The fourth team member was a psychologist, who was the team program manager/supervisor. A staff psychiatrist and a psychiatric nurse were also assigned to SMTU. The psychiatrist treated anxiety and depression with medication and was involved in crisis counseling. The nurse was involved in crisis counseling, psychoeducational activities, and administered medications.

Contrary to Plaintiff's unsubstantiated allegations, Cooper had no supervisory authority. She had no authority to move an inmate from SMTU to the Baker Ward ("Baker"), the licensed mental health treatment facility housing acutely psychotic inmates. Only the psychologist or a psychiatrist had the authority to have an inmate transferred to Baker.

---

[3] Suicide watches require security staff to "visually check the inmate for his/her welfare" at ten minute intervals. Section 1103.07.1.7.5.3.

[4] Mental health watches require security staff to "visually check the inmate for his/her welfare" at 30 minute intervals. Section 1103.07.1.8.5.

- 4 -

Cooper did testify, however, that if an inmate requested to be sent to Baker, it was her practice to inform the psychologist of the inmate's request. Cooper had no authority to change an inmate's security classification or housing assignment or authority to change the type of cell or the conditions of the cells used for mental health watches and suicide watches.

SMTU staff met informally everyday to discuss the needs of inmates in the unit. They "formally staffed" each inmate once a week. Written treatment plans involving the input of all SMTU staff were required to be updated every 90 days. As a Psychology Associate II, Cooper's job was to conduct one-on-one therapy with inmates assigned to SMTU, either at cell front or in a small room used by the psychiatrist to treat inmates. She also conducted group therapy. At times she might have interacted numerous times a day with an inmate, and each time she would document her therapy sessions on the inmate's cell-front log. Cooper was Aaron's assigned therapist beginning in August 2004.

On May 6, 2005, Aaron told Cooper that he wanted to return to Baker, he wanted to go to heaven, and he had fallen and hurt his knee. He was anxious, had restricted affect, and was paranoid about his medical symptoms. Based on her experience, her conversation with him, and her observations, Cooper did not believe him to be suicidal or homicidal. Nevertheless, Cooper wanted Aaron monitored frequently by security and staff so that if he began to decompensate, i.e., get worse, appropriate action could be taken for his protection. After consultation with the psychologist, Cooper placed Aaron on a 30 minute health watch.

On May 9, 2005, Aaron's watch was discontinued by the psychologist. On May 10, 2005, at 1630 hours, Cooper was told by security staff that Aaron was lying in his bed requesting a diaper as he had urinated and had bowel movements in his sheet. Cooper went to Aaron's cell where he appeared calm but refused to answer Cooper's questions. Cooper did not believe that soiling his bed presented an imminent suicide risk. After consulting with the psychologist, Cooper placed Aaron on a mental health watch to determine if his mental condition was decompensating.

On May 11, 2005, the day before Aaron committed suicide, Cooper spoke to Aaron

- 5 -

at the holding cell at 1500 hours. He appeared calm and he was conversant. He told Cooper that he wanted to go back to his regular cell but was complaining about his arms. It was Cooper's opinion that Aaron had improved from the previous day, was not psychotic, and displayed no imminent suicidal ideation. However, out of caution for his welfare and protection, Cooper continued his mental health watch, as she knew that he needed to be observed every 30 minutes by security staff and periodically by nursing staff. On May 12, 2005, Aaron committed suicide by stuffing a wad of toilet paper down his throat. He had received the toilet paper from a security guard that was on duty the previous night. Cooper was working outside of the Eyman complex for the day when she learned of Aaron's death.[5]

II. Legal Standard and Analysis

The standard for summary judgment is set forth in Rule 56(c) of the Federal Rules of Civil Procedure. Under this rule, summary judgment is properly granted when, after viewing the evidence in the light most favorable to the non-moving party, no genuine issues of material fact remain for trial. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of demonstrating that it is entitled to summary judgment. Mur-ray Mgmt. Corp. v. Founders Title Co., 819 P.2d 1003, 1005 (Ariz. Ct. App. 1991). If the moving party makes a prima facie case showing that no genuine issue of material fact exists, the burden shifts to the opposing party to produce sufficient competent evidence to show that a triable issue of fact does remain. Ancell v. United Station Assocs., Inc., 803 P.2d 450, 452 (Ariz. Ct. App. 1990). The Court must regard as true the non-moving party's evidence, if it is supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324. However, the non-moving party may not merely rest on its pleadings, it must produce some significant probative evidence tending to contradict the moving party's allegations and thereby creating a material question of fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57(1986)(holding that the plaintiff must present affirmative evidence

---

[5] Aaron's holding cell was located in the SMTU in the Eyman complex.

in order to defeat a properly supported motion for summary judgment); First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968).

**Qualified Immunity**

Cooper contends that she is entitled to qualified immunity because her conduct did not violate Aaron's "clearly established" constitutional rights.

The doctrine of qualified immunity shields public officers acting in their official capacities from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Hufford v. McEnaney, 249 F.3d 1142, 1148 (9th Cir. 2001). If it is determined that Cooper is entitled to qualified immunity, no material issues of fact will remain for trial with respect to the section 1983 claim asserted against Cooper. See Hemphill v. Kinchelowe, 987 F.2d 589, 593 (9th Cir. 1993). Determining qualified immunity is a two-step analysis. The threshold inquiry is whether, when taken in the light most favorable to the non-moving party, the facts alleged show that the official's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). If so, the court turns to the second inquiry and asks if the right was clearly established at the relevant time. Id. at 201-02. The second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. at 201. If the answer is negative, the official is entitled to qualified immunity. Id.

To determine whether Plaintiff can satisfy the threshold question, the Court must establish whether Cooper's conduct violated Aaron's Eighth Amendment rights as alleged by Plaintiff. To do so, the Court must decide whether or not Cooper was deliberately indifferent to Aaron's mental health care by placing him on the mental health watch he was on during the time he committed suicide.[6] In determining the existence of deliberate indifference, the court must consider the seriousness of the prisoner's medical need and the nature of the specific defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050,

---

[6] This was Plaintiff's specific allegation against Cooper.

1059 (9th Cir. 1992), *overruled on other grounds by* WMX Techs, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir 1997). Plaintiff must show that Cooper "purposefully ignored or failed to respond to his pain or possible medical need." Id. at 1060. In Farmer v. Brennan, 511 U.S. 825, 837 (1994), the Supreme Court instructed that the state of mind of the defendant is to be viewed from a subjective, rather than objective viewpoint. The Ninth Circuit expounded, "[o]nly if the person 'knows of and disregards an excessive risk to inmate health and safety.' . . . it is not enough that the person merely 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, he must also draw that inference.' If a person *should have been aware* of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk." See Gibson v. County of Washoe, 290 F.3d 1175, 1187-88 (9th Cir. 2002) (quoting Farmer, 511 U.S. at 837, citing Jeffers v. Gomez, 267 F.3d 895, 914 (9th Cir. 2001))(emphasis added).

Plaintiff argues that Cooper was deliberately indifferent to Aaron's medical needs by placing him on mental health watch the day he committed suicide. On May 10, 2005, two days prior to Aaron's suicide, Cooper was called to Aaron's cell because he had urinated and had bowel movements in his sheet and was lying in bed requesting a diaper. Cooper met with Aaron and although he appeared calm, he refused to answer her questions. Cooper opined that his situation did not present an imminent suicide risk. However, after consulting with the psychologist, it was determined to be in Aaron's best interest for Cooper to place Aaron on a mental health watch to determine if his mental condition was decompensating. (Id.)

When Cooper placed Aaron on mental health watch after consulting with her superior, she exercised her professional judgment and acted for his well-being and protection. Even if Plaintiff could establish that Cooper's judgment amounted to malpractice or poor judgment, a showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment. See Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002)("Mere medical malpractice does not constitute cruel and unusual punishment.") (citation omitted); see also Wood, 900 F.2d at 1334 (stating that even gross

- 8 -

negligence is insufficient to establish a constitutional violation). There is no evidence to establish that her decisions were not in his best interest nor contrary to ADC policy. Moreover, in Casey, the District Court of Arizona found that the same policy under which Aaron was treated, which specifically included the relevant parameters for suicide and mental health watches, did not violate the Eighth Amendment. Casey v. Lewis, 834 F.Supp.1477 (D. Arizona. 1993).

It is undisputed that after meeting with Aaron on May 11, 2005, it was Cooper's professional opinion that out of caution for his welfare and protection, and based on Aaron's mental condition, continuing his mental health watch was in Aaron's best interest. Deliberate indifference is a high legal standard. Based upon the evidence, it was Cooper's belief Aaron was still in need of observation. Plaintiff has failed to establish with evidentiary support that placing Aaron on mental health watch amounts to purposefully ignoring or failing to respond to his pain or possible medical need. See Farmer, 511 U.S. at 837. There has been no evidence proffered by Plaintiff establishing deliberate indifference on the part of Cooper.

Aaron's ADC mental health records document that he received extensive mental health care while under the care and treatment of Cooper and her teammates. Furthermore, as previously established by the undisputed evidence, Cooper was one member of a mental health care *team* of professionals to provide care to him in 2005. Plaintiff failed to articulate any individual action or inaction on the part of Cooper that caused injury to or the death of Aaron. The plaintiff "must establish individual fault . . . as to each individual defendant's deliberate indifference." Redman v. County of San Diego, 942 F.2d 1435, 1454 (9th Cir. 1991).

Plaintiff's next assertions are that Cooper was deliberately indifferent to Aaron's medical needs by failing to ensure that he was placed in the appropriate facility and that she failed to transfer him to the Baker Ward. The Court finds that these allegations are without merit. As previously established by the undisputed evidence, Cooper did not have the authority to transfer inmates or change an inmate's classification. When an inmate seeks to

hold an *individual defendant* personally liable for damages, the court must focus on whether the individual defendant was in a position to take steps to avert additional harm, but failed to do so intentionally or with deliberate indifference. Leer v. Murphy, 844 F.2d 628, 633-34 (9th Cir. 1988)(internal citations omitted). In the instant matter, Cooper worked as a member of a team. In her position as a Psychology Associate, she did not have the authority to make the decisions that Plaintiff alleges would have prevented the death of her son. Cooper was not in the position to avert the steps that Plaintiff speculates would have prevented the death of her son. Id.

Even when considering the facts in the light most favorable to Patterson, the Court finds that she has failed to establish that the specific facts alleged show that Cooper's conduct violated Aaron's constitutional rights. Patterson was unable to establish deliberate indifference on the part of Cooper. The record is replete with evidence establishing that Cooper acted to *prevent* harm to Aaron and that she acted pursuant to ADC's policy, DO 1103. Therefore, the Court need not address the second inquiry in the qualified immunity analysis, as Plaintiff has failed to satisfy her threshold burden.

Furthermore, the Court need not address Plaintiff's Fourteenth Amendment claim on Aaron's behalf, as the "shocks the conscience" standard is a higher standard than deliberate indifference, which Plaintiff was unable to establish.

Finally, as to Plaintiff's Fourteenth Amendment claim on her own behalf, Patterson alleges that the conduct of all the Defendants "violated (her) rights under the Fourteenth Amendment to a continued familial relationship" with Aaron. The Court has found that Cooper, the sole remaining Defendant, is entitled to qualified immunity. Therefore, it need not address this claim.

Accordingly,

/ / /

/ / /

/ / /

///

IT IS HEREBY ORDERED GRANTING SUMMARY JUDGMENT in favor of Defendant Jeannie Cooper. (Doc. 74.)

DATED this 22nd day of September, 2009.

*Paul G. Rosenblatt*
United States District Judge